1  Melissa G. Fulgencio (SBN 277663)
   E-mail: mel@upliftlaw.net
2  Crystal A. Dumbleton (SBN 323361)
   E-mail: crystal@upliftlaw.net
3  **UPLIFT LAW, PC**
4  650 N. Rose Drive, Ste. 620
   Placentia, CA 92870
5  Telephone:  (714) 248-5612
   Facsimile:   (714) 582-3990
6
7  Attorneys for Defendants,
   HOUSE OF GAINS and DAVID FIGG
8
9              **UNITED STATES DISTRICT COURT**
10            **CENTRAL DISTRICT OF CALIFORNIA**
11                  **WESTERN DIVISION**
12

| | |
|---|---|
| 13 COUNTY OF VENTURA and ROBERT LEVIN, M.D., in his capacity as Health Officer for Ventura County, | Case No.: _____ [Ventura County Superior Court Case No. 56-202 l -005 49346-CU-MC-VTA] |
| 15 Plaintiff, | **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1332 and 1441(c) (FEDERAL QUESTION)** |
| 16 v. | |
| 17 HOUSE OF GAINS GYM, INC.; DAVID FIGG; and DOES 1-1000, inclusive | |
| 19 Defendants. | |

20
21
22
23
24            **[REMAINDER OF PAGE INTENTIONALL LEFT BLANK]**
25
26
27
28

TO THE CLERK OF THE ABOVE-TITLED COURT:

PLEASE TAKE NOTICE that Defendants House of Gains Gym Inc., and David Figg (collectively, the "Defendants") hereby remove the action entitled County of Ventura and Robert Levin M.D., in his official capacity as Health Officer for Ventura County v. House of Gains Gym, Inc.; David Figg; and Does 1 through 1000, inclusive, Ventura County Superior Court Case No. 56-202l-005 49346-CU-MC-VTA (the "State Court Action") to the United States District Court for the Central District of California, Western Division. This removal is proper pursuant to 28 U.S.C. §§ 1332 and 1441(c). Defendant's removal of this action is based on the following:

1. On January 8, 20201 Plaintiffs filed a Complaint in the Superior Court of the State of California for the County of Ventura entitled County of Ventura vs. House of Gains Gym Inc. Case No. 56-202l-005 49346-CU-MC-VTA.

2. This civil action is currently pending in the Superior Court of the State of California for the County of Ventura.

3. On January 11, 2021 Plaintiffs filed a proof of personal service a Summons and Complaint. On January 21, 2021, Plaintiffs filed a proof of substituted service of a Summons and Complaint. At an *ex-parte* hearing on January 14, 2021, Superior Court Judge Mark Borrell confirmed proper service on Defendants. This notice of removal, filed on February 4, 2021 is filed within thirty days after service of the Summons and Complaint, and is therefore timely under 28 U.S.C. § 1446(b).

4. This Court has original jurisdiction of the above-entitled action pursuant to 28 U.S.C. § 1331, on the basis that it is an action arising under federal law. The action may therefore be removed to this Court pursuant to 28 U.S.C. § 1441(c). The Complaint alleges the following causes of action against the removing party, the Defendant in this case: Violation of Public Health Orders; and Public Nuisance. The Public Health Orders arise under the federal Executive Orders and Stay At Home Orders issued by Governor Gavin Newsom and the State of California under their Constitutional powers.

5. Copies of all process, pleadings, and orders served on the Defendants are attached to

1    this Notice as Exhibits A.

2        6. Venue is proper in this Court because this is the District Court of the United States for

3    the District within which Superior Court of the State of California of the County of Ventura Case

4    No. 56-202l-005 49346-CU-MC-VTA is pending.

5        7. Defendants will promptly provide written notice of this Notice of Removal to Plaintiffs'

6    counsel. See 28 U.S.C. § 1446(d). In addition, Defendants will file the notice attached as Exhibit

7    B in the State Court Action immediately after filing this Notice of Removal with this Court.

8        Accordingly, Defendants remove the above-captioned action from the Superior Court of

9    California, County of Ventura, and respectfully requests that all further proceedings be conducted

10    in this Court as provided by law.

11                           **UPLIFT LAW, PC**

12

13    Dated: February 4, 2021         By: _____

14                                Melissa G. Fulgencio,

15                                Crystal A. Dumbleton
                                  Attorneys for Defendants,

16                                House of Gains and David Figg

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
HOUSE OF GAINS GYM, INC.; DAVID FIGG and DOES 1-1000, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

County of Ventura and Robert Levin, M.D., in his capacity as Health Officer for Ventura County

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**VENTURA SUPERIOR COURT FILED**

JAN 08 2021

MICHAEL D. PLANET
Executive Officer and Clerk
By: _____ M. SOTO _____, Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* Ventura County Superior Court, 800 South Victoria Avenue, Ventura, California 93009 | CASE NUMBER: *(Número del Caso):* 56-2021-00549346-CU-MC-VTA |
| --- | --- |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jaclyn Smith, Assistant County Counsel, S/B 274311, 800 S. Victoria Avenue, L/C 1830, Ventura, CA 93009 (805) 654-2773

DATE: 1/8/2021    MICHAEL D. PLANET    Clerk, by    M. SOTO    , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* House of Gains Gym, Inc.

   under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412 20, 465
www.courts.ca.gov

1  MICHAEL G. WALKER. State Bar No. 150554
   County Counsel, County of Ventura
2  JACLYN SMITH, State Bar No. 274311
   Assistant County Counsel
3  CHRISTINE RENSHAW, State Bar No. 249618
   Assistant County Counsel
4  800 South Victoria Avenue, L/C #1830
   Ventura, California 93009
5  Telephone:   (805) 654-2580
   Facsimile:   (805) 654-2185
6  E-mail:      jaclyn.smith@ventura.org

7  Attorneys for Plaintiffs County of Ventura
   and Robert Levin, M.D., in His Capacity as
8  Health Officer for Ventura County

VENTURA
SUPERIOR COURT
FILED

JAN 08 2021

MICHAEL D. PLANET
Executive Officer and Clerk
By:_____ M. SOTO , Deputy

(EXEMPT FROM FILING
FEES [Gov. Code, § 6103].)

9
10        SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

11                                              No.   56-2021-00549346-CU-MC-VTA
12  COUNTY OF VENTURA and ROBERT )
    LEVIN, M.D., in his capacity as Health )    VERIFIED COMPLAINT FOR
13  Officer for Ventura County,              )   TEMPORARY RESTRAINING ORDER,
                                             )   PRELIMINARY INJUNCTION AND
14               Plaintiffs,                 )   PERMANENT INJUNCTION FOR
                                             )   VIOLATION OF HEALTH ORDERS
15        vs.                                )   AND FOR PUBLIC NUISANCE
                                             )
16  HOUSE OF GAINS GYM, INC.;                )   [Deemed verified pursuant to Code Civ.
    DAVID FIGG and DOES 1-1000,              )   Proc., § 446]
17  inclusive,                               )
                                             )
18               Defendants.                 )

19        Plaintiffs County of Ventura and Robert Levin, M.D., in his capacity as Health

20  Officer for Ventura County, allege as follows:

21                            **General Allegations**

22        1. Plaintiff County of Ventura is and at all times relevant herein was a political

23  subdivision of the State of California (hereafter "County").

24        2. Plaintiff Robert Levin, M.D., is and all time since 1998 has been the duly

25  appointed health officer for the County and for all cities within Ventura County (hereafter

26  "County Health Officer").

27  ///
28
                                          1

VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

3. The property that is the subject of this complaint is located at 529 West Channel Islands Boulevard, Port Hueneme, California, Ventura County, California (hereafter "Property").

4. Defendant House of Gains Gym, Inc. is and at all times relevant herein operates a health club/fitness facility at the Property (hereafter "Gym").

5. Defendant David Figg is the owner/operator of Gym (hereafter "Figg"). Plaintiffs are informed and believe, and thereon allege, that Figg is responsible in some manner for the nuisance and violation of the health orders and directives issued by the State of California ("State") as herein alleged.

6. The defendants named as Does 1 through 1,000, inclusive, are sued and designated by fictitious names pursuant to Code of Civil Procedure section 474, for the reason that their true names and capacities are unknown to plaintiffs. Plaintiffs will amend the complaint to show the true names and capacities of such defendants fictitiously named when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the Doe defendants is responsible in some manner for the nuisance and violation of the health orders and directives issued by the State as herein alleged.

7. Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned herein, each of the defendants were and now are the agents, officers, employees, members, representatives, or alter egos of one or more of the remaining defendants, and, in doing the things hereinafter alleged, were acting within the scope of their authority as such agents, officers, employees, members, representatives or alter egos with the permission and consent of the remaining defendants.

8. On March 4, 2020, the Governor of the State of California (hereafter "Governor") declared a state of emergency in California due to the threat of the 2019 novel coronavirus (hereafter "COVID-19"). The declaration of state of emergency remains in effect. On March 12, 2020, the Governor issued Executive Order N-25-20 ordering all state residents to heed any orders and guidance of state and local public

///

2

1  health officials with respect to COVID-19.  A true and correct copy of Executive Order

2  N-25-20 is attached hereto as Exhibit A and incorporated herein by reference.

3        9. On March 12, 2020, the County Health Officer declared a local health

4  emergency pursuant to Health and Safety Code section 101080 due to the COVID-19

5  pandemic.  On March 17, 2020, the County Board of Supervisors adopted a resolution

6  proclaiming that a local emergency and a local health emergency exist in Ventura County

7  due to the COVID-19 pandemic and ratifying the declaration of local health emergency

8  by the County Health Officer.  The proclamation of local emergency and declaration of

9  local health emergency remain in effect.

10        10. The Governor's Proclamation of a State Emergency issued on March 4, 2020,

11  waived the 30-day time period in Health and Safety Code section 101080, within which a

12  local governing authority must renew a local health emergency for the duration of the

13  statewide emergency.

14        11. On March 19, 2020, the Governor issued Executive Order N-33-20 ordering

15  all residents to immediately heed the current state public health directives.  A true and

16  correct copy of Executive Order N-33-20 is attached hereto as Exhibit B and incorporated

17  herein by reference.  Within that executive order, the State Public Health Officer and the

18  Director of the California Department of Public Health (hereafter "CDPH"), ordered,

19  among other things, that all individuals stay home except as essential needs required.

20        12. Since the initial COVID-19 declaration was made in March 2020, the State –

21  through executive orders of the Governor and guidance documents promulgated by the

22  State Public Health Officer – has issued evolving regulations governing industry,

23  businesses and activities conducted within the State during the COVID-19 pandemic.

24        13. On August 28, 2020, the State implemented the currently operative "Blueprint

25  for a Safer Economy" which sets forth a tiered system based upon how prevalent COVID-

26  19 is in each county and the extent of community spread.  ("Governor Newsom Unveils

27  Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with

28  COVID-19" (August 28, 2020)

VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

1  &lt;https://www.gov.ca.gov/2020/08/28/governor-newsom-unveils-blueprint-for-a-safer-eco

2  nomy-a-statewide-stringent-and-slow-plan-for-living-with-covid-19/&gt; [as of January 8,

3  2021].) The "Blueprint for a Safer Economy" restricts when sectors and activities may

4  operate indoors and limits how many people may participate based on transmission risk.

5  The tiered system consists of four categories:  purple (widespread), red (substantial),

6  orange (moderate) and yellow (minimal).  A true and correct copy of the California

7  Department of Health's Blueprint for a Safer Economy Activity and Business Tiers is

8  attached hereto as Exhibit C and incorporated herein by reference.  The Blueprint for a

9  Safer Economy remains in effect as of the date this complaint is signed.

10         14.  Under the Blueprint for a Safer Economy, in counties classified in the purple

11  tier, gyms and fitness centers are only permitted to operate outdoors, with modifications.

12  (Exhibit C, at p. 4; see also, Industry Guidance for Gyms and Fitness Centers (December

13  3, 2020) &lt;https://covid19.ca.gov/industry-guidance/#fitness-guidance&gt; [as of January 8,

14  2021].)

15         15.  The State, through the CDPH, has also issued "COVID-19 Industry Guidance

16  for Fitness Facilities."  A true and correct copy of the COVID-19 Industry Guidance for

17  Fitness Facilities is attached hereto as Exhibit D and incorporated herein by reference.

18  The guidance restates the requirement that in counties classified in the purple tier, gyms

19  and fitness facilities are permitted to operate outdoors only.  The guidance further

20  requires that "[o]utdoor operations may be conducted under a tent, canopy, or other sun

21  shelter as long as no more than one side is closed, allowing sufficient outdoor air

22  movement." (Exhibit D, at p. 3.)  The guidance further requires that members of the

23  public and staff use face coverings while at a gym or fitness center and that gyms and

24  fitness centers implement measures to ensure physical distancing of at least six feet

25  between and among workers and patrons, among other requirements.  (Exhibit D, at pp. 4,

26  11-12.)

27         16.  The County has been classified in the most restrictive tier, the purple tier,

28  since November 16, 2020, due to the high rate of COVID-19 transmission in the County.

4

1    17.  COVID-19 spreads by way of person-to-person contact.  The virus spreads

2    easily and sustainably, as demonstrated by the continuous rise in the number of persons

3    infected by the disease both locally and nationally.  COVID-19 continues to present an

4    imminent and proximate threat to the residents of Ventura County.  It is essential to

5    control the spread of COVID-19 as much as possible and prevent the health care system

6    from being overwhelmed.

7    18.  California is presently experiencing a massive surge in COVID-19 infections,

8    hospitalizations and deaths.

9    19.  In light of an "unprecedented rise in the rate of increase in COVID-19 cases,

10   hospitalizations, and test positivity rates across California," the State Public Health

11   Officer issued a Regional Stay-At-Home Order ("Regional Order") on December 3, 2020.

12   A true and correct copy of the Regional Order is attached hereto as Exhibit E and

13   incorporated herein by reference.  According to the State Public Health Officer,

14   "[b]ecause the rate of increases in new cases continues to escalate and threatens to

15   overwhelm the [S]tate's hospital system, further aggressive action is necessary to respond

16   to the quickly evolving situation."  (Exhibit E, at p. 1.)  The Regional Order applies in

17   regions of the State with less than 15 percent ICU bed capacity.  (Exhibit E, § 2.)

18   Pursuant to the Regional Order, "[a]ll gatherings with members of other households are

19   prohibited . . . except as expressly permitted [in the order]."  (Exhibit E, § 2(a).)  The

20   Regional Order further requires that "[a]ll individuals living in the Region shall stay

21   home or at their place of residence except as necessary to conduct activities associated

22   with the operation, maintenance, or usage of critical infrastructure, as required by law, or

23   as specifically permitted by this order."  (Exhibit E, § 2(b).)  Gyms in counties under the

24   Regional Order must stop indoor operations.  ("About COVID-19 restrictions" (Jan. 5,

25   2021) <https://covid19.ca.gov/stay-home-except-for-essential-needs/#regional> [as of

26   Jan. 9, 2021].)

27   20.  The Regional Order "shall remain in place for at least three weeks from the

28   date the order takes effect in a Region and shall continue until CDPH's four-week

5

1  projections of the Region's total available adult ICU bed capacity is greater than or equal

2  to 15%." (Exhibit E, §§ 4 & 6.)  After the termination of the Regional Order, "each

3  county within the Region will be assigned to a tier based on the Blueprint for a Safer

4  Economy" and the county is subject to the restrictions of the Blueprint appropriate to that

5  tier. (Exhibit E, § 7.)

6       21.  The County is located within the Southern California Region, which fell under

7  the purview of the Regional Order as of December 6, 2020.  As of the date of the signing

8  of this complaint, the ICU capacity in the Southern California Region remains at

9  0 percent and the Regional Order remains in effect.  Hereinafter, the Blueprint for a Safer

10 Economy and the Regional Order shall be referred to collectively as the "Health Orders."

11      22.  Pursuant to Government Code section 8634, during a local emergency, the

12 County Health Officer may promulgate orders as necessary to provide for the protection

13 of life and property.

14      23.  Pursuant to Health and Safety Code section 101040, subdivision (a), the

15 County Health Officer "may take any preventive measure that may be necessary to protect

16 and preserve the public health from any public health hazard during any 'state of war

17 emergency,' 'state of emergency,' or 'local emergency,' as defined by Section 8558 of the

18 Government Code, within his or her jurisdiction."  Furthermore, pursuant to Health and

19 Safety Code section 120175, the County Health Officer, "knowing or having reason to

20 believe that any case of the diseases made reportable by regulation of [CDPH], or any

21 other contagious, infectious or communicable disease exists, or has recently existed,

22 within the territory under his or her jurisdiction, shall take measures as may be necessary

23 to prevent the spread of the disease or occurrence of additional cases."

24      24.  In the face of all of the foregoing, prior to August 28, 2020 and continuing

25 thereafter, the Gym, Figg and Does 1-1,000 have conducted, participated in, arranged,

26 scheduled, operated and allowed indoor fitness operations to occur at the Property in

27 violation of the Health Orders by hosting, facilitating, encouraging and participating in

28 indoor fitness operations.  Further, during the indoor fitness operations, participants,

6

1  customers and attendees, including, without limitation, Figg, have failed to comply with
2  the mandate of the State Public Health Order to wear face coverings and practice social
3  distancing, and the Gym, Figg and Does 1-1,000 have permitted, allowed and encouraged
4  the violations of these mandates.

5     25. After receiving complaints about indoor fitness operations on the Property, the
6  County Health Officer issued a closure order to Gym on July 23, 2020.[1/]  The Emergency
7  Disaster Preparedness Manager for the City of Port Hueneme served the Gym and Figg
8  with the closure order.  A true and correct copy of the closure order is attached hereto as
9  Exhibit F and incorporated herein by reference.

10    26.  The Gym and Figg initially complied with the closure order but after a period
11  of time started advertising plans to re-open regardless of the closure order.

12    27. The City of Port Hueneme began receiving numerous complaints about the
13  Gym and Figg allowing indoor fitness operations to continue at the Property following the
14  issuance of the closure order.  Following issuance of the closure orders, Gym, Figg and
15  Does 1-1,000 continued to conduct, participate in, arrange, schedule, operate and allow
16  indoor fitness operations at the Property.

17    28. On or around September 19, 2020, code compliance officers for the City of
18  Port Hueneme conducted an unscheduled inspection of the Property.  During the
19  inspection, the code compliance officers witnessed approximately 20-25 persons inside
20  the Gym using the fitness facilities on the Property.  No one was wearing facial coverings
21  or practicing social distancing.

22    29.  Most recently, as of November 16, 2020 and thereafter, Gym, Figg and Does,
23  1-1,000 continue to facilitate and allow indoor fitness operations at the Property in
24  violation of the Health Orders and despite the issuance of a closure order.

25  / / /
26  / / /
27
28

---

[1/]Indoor fitness operations were also prohibited under the State's COVID-19 health orders preceding the Blueprint for a Safer Economy.

7

30. The Gym and Figg, in public statements and on social media, have represented that they will continue to violate the Health Orders and the closure order and will continue to permit indoor fitness operations at the Property.

## FIRST CAUSE OF ACTION
## VIOLATION OF HEALTH ORDERS
### (Against All Defendants)

31. Plaintiffs reallege and incorporate by reference paragraphs 1 through 30 of this complaint.

32. The wrongful conduct of defendants, and each of them, as alleged herein, unless and until enjoined and restrained by the court, will cause and continue to cause great and irreparable injury to the general public, including all persons within Ventura County, by creating a significant risk of further community spread of COVID-19, including hospitalizations and deaths, which in turn is likely to result in continued and further restrictions on businesses and other operations and activities within Ventura County, detrimentally affecting the quality of life of the entire community.

33. Plaintiffs have no adequate remedy at law because the amount of the damages to the general public's health, safety and welfare is unascertainable and damages cannot compensate for the societal disruption, illnesses and deaths caused by the callous disregard of statewide health orders during a global pandemic.

## SECOND CAUSE OF ACTION
## PUBLIC NUISANCE
### (Against All Defendants)

34. Plaintiffs reallege and incorporate by reference paragraphs 1 through 33 of this complaint.

35. The wrongful conduct of defendants, and each of them, as alleged herein, constitutes a public nuisance per se.

///

8

1

## PRAYER

2    WHEREFORE, plaintiffs pray for judgment against defendants, and each of them,

3   as to all causes of action as follows:

4    A.  For a temporary restraining order, a preliminary injunction and a permanent

5   injunction, all enjoining and prohibiting defendants, and each of them, and their agents,

6   employees, representatives, members, and volunteers, and all persons acting under, in

7   concert with or for them, from violating the closure orders and the Health Orders as they

8   pertain to the operation of gyms or fitness centers while the County is under the Regional

9   Order and/or classified in the purple tier;

10    B.  For costs of suit; and

11    C.  For such other and further relief as the court deems just and proper.

12                              MICHAEL G. WALKER
                               County Counsel, County of Ventura

13

14
Dated: January 8, 2021          By_____

15                                 JACLYN SMITH
                                   Assistant County Counsel

16
                               CHRISTINE RENSHAW
17                             Assistant County Counsel

18                             Attorneys for Plaintiffs County of Ventura
                               and Robert Levin, M.D., in His Capacity as
19                             Health Officer for Ventura County

20

21

22

23

24

25

26

27

28

9

# Exhibit A

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

EXECUTIVE ORDER N-25-20

WHEREAS on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

WHEREAS despite sustained efforts, the virus remains a threat, and further efforts to control the spread of the virus to reduce and minimize the risk of infection are needed; and

WHEREAS state and local public health officials may, as they deem necessary in the interest of public health, issue guidance limiting or recommending limitations upon attendance at public assemblies, conferences, or other mass events, which could cause the cancellation of such gatherings through no fault or responsibility of the parties involved, thereby constituting a force majeure; and

WHEREAS the Department of Public Health is maintaining up-to-date guidance relating to COVID-19, available to the public at http://cdph.ca.gov/covid19; and

WHEREAS the State of California and local governments, in collaboration with the Federal government, continue sustained efforts to minimize the spread and mitigate the effects of COVID-19; and

WHEREAS there is a need to secure numerous facilities to accommodate quarantine, isolation, or medical treatment of individuals testing positive for or exposed to COVID-19; and

WHEREAS, many individuals who have developmental disabilities and receive services through regional centers funded by the Department of Developmental Services also have chronic medical conditions that make them more susceptible to serious symptoms of COVID-19, and it is critical that they continue to receive their services while also protecting their own health and the general public health; and

WHEREAS individuals exposed to COVID-19 may be temporarily unable to report to work due to illness caused by COVID-19 or quarantines related to COVID-19 and individuals directly affected by COVID-19 may experience potential loss of income, health care and medical coverage, and ability to pay for housing and basic needs, thereby placing increased demands on already strained regional and local health and safety resources such as shelters and food banks; and

WHEREAS in the interest of public health and safety, it is necessary to exercise my authority under the Emergency Services Act, specifically Government Code section 8572, to ensure adequate facilities exist to address the impacts of COVID-19; and

**Exhibit A, Page 1 of 5**

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8571 and 8572, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19.

2. For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 2627(b)(1) for disability insurance applicants who are unemployed and disabled as a result of the COVID-19, and who are otherwise eligible for disability insurance benefits.

3. For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 1253(d) for unemployment insurance applicants who are unemployed as a result of the COVID-19, and who are otherwise eligible for unemployment insurance benefits.

4. Notwithstanding Health and Safety Code section 1797.172(b), during the course of this emergency, the Director of the Emergency Medical Services Authority shall have the authority to implement additions to local optional scopes of practice without first consulting with a committee of local EMS medical directors named by the EMS Medical Directors Association of California.

5. In order to quickly provide relief from interest and penalties, the provisions of the Revenue and Taxation Code that apply to the taxes and fees administered by the Department of Tax and Fee Administration, requiring the filing of a statement under penalty of perjury setting forth the facts for a claim for relief, are suspended for a period of 60 days after the date of this Order for any individuals or businesses who are unable to file a timely tax return or make a timely payment as a result of complying with a state or local public health official's imposition or recommendation of social distancing measures related to COVID-19.

6. The Franchise Tax Board, the Board of Equalization, the Department of Tax and Fee Administration, and the Office of Tax Appeals shall use their administrative powers where appropriate to provide those individuals and businesses impacted by complying with a state or local public health official's imposition or recommendation of social

distancing measures related to COVID-19 with the extensions for filing, payment, audits, billing, notices, assessments, claims for refund, and relief from subsequent penalties and interest.

7. The Governor's Office of Emergency Services shall ensure adequate state staffing during this emergency. Consistent with applicable federal law, work hour limitations for retired annuitants, permanent and intermittent personnel, and state management and senior supervisors, are suspended. Furthermore, reinstatement and work hour limitations in Government Code sections 21220, 21224(a), and 7522.56(b), (d), (f), and (g), and the time limitations in Government Code section 19888.1 and California Code of Regulations, title 2, sections 300-303 are suspended. The Director of the California Department of Human Resources must be notified of any individual employed pursuant to these waivers.

8. The California Health and Human Services Agency and the Office of Emergency Services shall identify, and shall otherwise be prepared to make available—including through the execution of any necessary contracts or other agreements and, if necessary, through the exercise of the State's power to commandeer property – hotels and other places of temporary residence, medical facilities, and other facilities that are suitable for use as places of temporary residence or medical facilities as necessary for quarantining, isolating, or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period.

9. The certification and licensure requirements of California Code of Regulations, Title 17, section 1079 and Business and Professions Code section 1206.5 are suspended as to all persons who meet the requirements under the Clinical Laboratory Improvement Amendments of section 353 of the Public Health Service Act for high complexity testing and who are performing analysis of samples to test for SARS-CoV-2, the virus that causes COVID-19, in any certified public health laboratory or licensed clinical laboratory.

10. To ensure that individuals with developmental disabilities continue to receive the services and supports mandated by their individual program plans threatened by disruptions caused by COVID-19, the Director of the Department of Developmental Services may issue directives waiving any provision or requirement of the Lanterman Developmental Disabilities Services Act, the California Early Intervention Services Act, and the accompanying regulations of Title 17, Division 2 of the California Code of Regulations. A directive may delegate to the regional centers any authority granted to the Department by law where the Director believes such delegation is necessary to ensure services to individuals with developmental disabilities. The Director shall describe the need justifying the waiver granted in each directive and articulate how the waiver is necessary to protect the public health or safety from the threat of COVID-19 or necessary to ensure that services to individuals with developmental disabilities are not disrupted. Any waiver granted by a directive shall expire 30 days from the date of its issuance. The Director may grant one or more 30-day extensions if the waiver continues to be necessary

**Exhibit A, Page 3 of 5**

to protect health or safety or to ensure delivery of services. The
Director shall rescind a waiver once it is no longer necessary to protect
public health or safety or ensure delivery of services. Any waivers and
extensions granted pursuant to this paragraph shall be posted on the
Department's website.

11. Notwithstanding any other provision of state or local law, including the
Bagley-Keene Act or the Brown Act, a local legislative body or state
body is authorized to hold public meetings via teleconferencing and to
make public meetings accessible telephonically or otherwise
electronically to all members of the public seeking to attend and to
address the local legislative body or state body, during the period in
which state or local public officials impose or recommend measures to
promote social distancing, including but not limited to limitations on
public events. All requirements in both the Bagley-Keene Act and the
Brown Act expressly or impliedly requiring the physical presence of
members, the clerk or other personnel of the body, or of the public as
a condition of participation in or quorum for a public meeting are
hereby waived.

In particular, any otherwise-applicable requirements that

(i)    state and local bodies notice each teleconference location
       from which a member will be participating in a public
       meeting;
(ii)   each teleconference location be accessible to the public;
(iii)  members of the public may address the body at each
       teleconference conference location;
(iv)   state and local bodies post agendas at all teleconference
       locations;
(v)    at least one member of the state body be physically present
       at the location specified in the notice of the meeting; and
(vi)   during teleconference meetings, a least a quorum of the
       members of the local body participate from locations within
       the boundaries of the territory over which the local body
       exercises jurisdiction

are hereby suspended, on the conditions that:

(i)    each state or local body must give advance notice of each
       public meeting, according to the timeframe otherwise
       prescribed by the Bagley-Keene Act or the Brown Act, and
       using the means otherwise prescribed by the Bagley-Keene
       Act or the Brown Act, as applicable; and
(ii)   consistent with the notice requirement in paragraph (i), each
       state or local body must notice at least one publicly
       accessible location from which members of the public shall
       have the right to observe and offer public comment at the
       public meeting, consistent with the public's rights of access
       and public comment otherwise provided for by the Bagley-
       Keene Act and the Brown Act, as applicable (including, but
       not limited to, the requirement that such rights of access and
       public comment be made available in a manner consistent
       with the Americans with Disabilities Act).

**Exhibit A, Page 4 of 5**

In addition to the mandatory conditions set forth above, all state and local bodies are urged to use sound discretion and to make reasonable efforts to adhere as closely as reasonably possible to the provisions of the Bagley-Keene Act and the Brown Act, and other applicable local laws regulating the conduct of public meetings, in order to maximize transparency and provide the public access to their meetings.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 12th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

**Exhibit A, Page 5 of 5**

# Exhibit B

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-33-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

**Exhibit B, Page 1 of 2**

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

**Exhibit B, Page 2 of 2**

# Exhibit C

# Blueprint for a Safer Economy

## Activity and Business Tiers

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Critical Infrastructure | Open with modifications | Open with modifications | Open with modifications | Open with modifications |
| Gatherings* | Outdoor gatherings only with modifications<br>• Max 3 households | Indoor gatherings strongly discouraged, allowed with modifications<br>• Max 3 households | Indoor gatherings strongly discouraged, allowed with modifications<br>• Max 3 households | Indoor gatherings strongly discouraged, allowed with modifications<br>• Max 3 households |
| Limited Services | Open with modifications | Open with modifications | Open with modifications | Open with modifications |
| Outdoor Playgrounds & Outdoor Recreational Facilities ** | Open with modifications | Open with modifications | Open with modifications | Open with modifications |
| Hair Salons & Barbershops | Open indoors with modifications | Open indoors with modifications | Open indoors with modifications | Open indoors with modifications |

1

**Exhibit C, Page 1 of 6**

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| **All Retail** (Including critical infrastructure, except standalone grocers) | Open indoors with modifications<br>• Max 25% capacity | Open indoors with modifications<br>• Max 50% capacity | Open indoors with modifications | Open indoors with modifications |
| **Shopping Centers (Malls, Destination Centers, Swap Meets)** | Open indoors with modifications<br>• Max 25% capacity<br>• Closed common areas<br>• Closed food courts | Open indoors with modifications<br>• Max 50% capacity<br>• Closed common areas<br>• Reduced-capacity food courts (see restaurants) | Open indoors with modifications<br>• Closed common areas<br>• Reduced capacity food courts (see restaurants) | Open indoors with modifications<br>• Reduced capacity food courts (see restaurants) |
| **Personal Care Services•••** | Open indoors with modifications | Open indoors with modifications | Open indoors with modifications | Open indoors with modifications |
| **Museums, Zoos, and Aquariums** | Outdoor Only with modifications | Open indoors with modifications<br>• Indoor activities max 25% capacity | Open indoors with modifications<br>• Indoor activities max 50% capacity | Open indoors with modifications |

2

**Exhibit C, Page 2 of 6**

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Places of Worship | Outdoor Only with modifications | Open indoors with modifications <br> • Max 25% capacity or 100 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity or 200 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity |
| Movie Theaters | Outdoor Only with modifications | Open indoors with modifications <br> • Max 25% capacity or 100 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity or 200 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity |
| Hotels and Lodging | Open with modifications | Open with modifications <br> • +Fitness centers (+10%) | Open with modifications <br> • +Fitness centers (+25%) <br> • +Indoor pools | Open with modifications <br> • +Fitness Centers (50%) <br> • +Spa facilities etc. |
| Gyms and Fitness Centers | Outdoor Only with modifications | Open indoors with modifications <br> • Max 10% capacity <br> • +Climbing walls | Open indoors with modifications <br> • Max 25% capacity <br> • +Indoor pools | Open indoors with modifications <br> • +Saunas <br> • +Steam rooms <br> • Max 50% capacity |

3

**Exhibit C, Page 3 of 6**

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Restaurants | Outdoor Only with modifications | Open indoors with modifications <br> • Max 25% capacity or 100 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity or 200 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity |
| Wineries | Outdoor Only with modifications | Outdoor Only with modifications | Open indoors with modifications <br> • Max 25% capacity indoors, or 100 people, whichever is fewer | Open indoors with modifications <br> • Max 50% capacity or 200 people indoors, whichever is fewer |
| Bars, Breweries, and Distilleries (where no meal provided) (follow restaurant guidance where meal is provided) | Closed | Closed | Open Outdoors with modifications | Open indoors with modifications <br> • Max 50% capacity |
| Family Entertainment Centers | Outdoor Only with modifications e.g. <br> • Kart Racing <br> • Mini Golf <br> • Batting Cages | Outdoor Only with modifications e.g. <br> • Kart Racing <br> • Mini Golf <br> • Batting Cages | Open indoors for naturally distanced activities with modifications <br> • Max 25% capacity <br> • Bowling Alleys | Open indoors for activities with increased risk of proximity and mixing with modifications <br> • Max 50% capacity <br> • Arcade Games <br> • Ice and roller skating <br> • Indoor playgrounds |

4

**Exhibit C, Page 4 of 6**

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Cardrooms, Satellite Wagering | Outdoor Only with modifications | Outdoor Only with modifications | Open indoors with modifications<br>• Max 25% capacity | Open indoors with modifications<br>• Max 50% capacity |
| Offices | Remote | Remote | Open indoors with modifications<br>• Encourage telework | Open indoors with modifications<br>• Encourage telework |
| Professional Sports | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications |
| Live Audience Sports*** | Closed | Closed | Outdoors Only<br>• Max 20%<br>• Regional visitors (120 miles)<br>• Advanced reservations only<br>• Assigned seating only<br>• In-seat concessions only (No concourse sales) | Outdoors Only<br>• Max 25%<br>• Regional visitors (120 miles)<br>• Advanced reservations only<br>• Assigned seating only<br>• In-seat concessions only (No concourse sales) |

5

**Exhibit C, Page 5 of 6**

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Amusement Parks*** | Closed | Closed | Smaller Parks Open<br>• 25% capacity or 500 people, whichever is fewer<br>• Outdoor attractions only<br>• In-county visitors only<br>• Advanced reservations only | Larger Parks Open<br>• 25% capacity<br>• Advanced reservations only |

*Gatherings updated November 13, 2020
**Outdoor playgrounds and outdoor recreational facilities updated September 28, 2020
***Personal care services, live audience professional sports and amusement parks updated October 20, 2020

6

**Exhibit C, Page 6 of 6**

# Exhibit D





# COVID-19 INDUSTRY GUIDANCE:
## Fitness Facilities

## October 20, 2020

*This guidance is designed to address sectors and activities opening statewide. However, local health officers may implement more stringent rules tailored to local epidemiological conditions, so employers should also confirm relevant local opening policies.*



# OVERVIEW

On March 19, 2020, the State Public Health Officer and Director of the California Department of Public Health issued an order requiring most Californians to stay at home to disrupt the spread of COVID-19 among the population.

The impact of COVID-19 on the health of Californians is not yet fully known. Reported illness ranges from very mild (some people have no symptoms) to severe illness that may result in death. Certain groups, including people aged 65 or older and those with serious underlying medical conditions, such as heart or lung disease or diabetes, are at higher risk of hospitalization and serious complications. Transmission is most likely when people are in close contact or in a poorly ventilated area with an infected person, even if that person does not have any symptoms or has not yet developed symptoms.

Precise information about the number and rates of COVID-19 by industry or occupational groups, including among critical infrastructure workers, is not available at this time. There have been multiple outbreaks in a range of workplaces, indicating that workers are at risk of acquiring or transmitting COVID-19 infection. Examples of these workplaces include hospitals, long-term care facilities, prisons, food production, warehouses, meat processing plants, restaurants, and grocery stores.

As stay-at-home orders are modified, it is essential that all possible steps be taken to ensure the safety of workers and the public.

Key prevention practices include:

- ✓ physical distancing to the maximum extent possible,
- ✓ use of face coverings by workers (where respiratory protection is not required) and fitness facility patrons,
- ✓ frequent handwashing and regular cleaning and disinfection,
- ✓ training workers on these and other elements of the COVID-19 prevention plan.

In addition, it will be critical to have in place appropriate processes to identify new cases of illness in workplaces and, when they are identified, to intervene quickly and work with public health authorities to halt the spread of the virus.

2

# PURPOSE

This document provides guidance for fitness facilities to support a safe, clean environment for workers, customers, and the public. Businesses must identify and monitor the County Risk Level for the county the business is operating in and make required adjustments to their operations:

- **Purple – Widespread – Tier 1:** Only outdoor operations are permitted. Outdoor operations may be conducted under a tent, canopy, or other sun shelter as long as no more than one side is closed, allowing sufficient outdoor air movement. Outdoor pools can open. Outdoor hot tubs can open only for use by household groups or in cases where six feet of distancing can be maintained. Indoor pools, hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Red – Substantial – Tier 2:** Indoor operations are permitted but must be limited to 10% capacity. Indoor pools, hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Orange – Moderate – Tier 3:** Indoor operations are permitted but must be limited to 25% capacity. Indoor pools can open when physical distancing can be maintained for non-household groups. Indoor pools do <u>not</u> include any indoor water parks or water rides. Indoor hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Yellow – Minimal – Tier 4:** Indoor operations are permitted but must be limited to 50% capacity. Indoor pools, hot tubs, saunas, and steam rooms can open but physical distancing must be maintained for non-household groups. Indoor pools do <u>not</u> include any indoor water parks or water rides. Gyms and fitness centers must follow this guidance.

For the most updated information on county status, visit <u>Blueprint for a Safer Economy</u>. Please note that local health departments can have more restrictive criteria and different closures. Find <u>your county's local information.</u>

**NOTE:** Fitness facilities may have a number of operational aspects and service offerings available in other guidance on the <u>Industry Guidance to Reduce Risk</u> website. Operators must review and adhere to the modifications in the guidance. Such operations include:

- Food service, snack or juice bars, and concessions (Restaurant guidance)

- Gift shops and retail operations (Retail guidance)

- Child care (Child Care guidance)

- Non-professional and amateur sports (Higher Education guidance)

- Youth sports (Youth Sports guidance)

- Outdoor recreation (Campgrounds, RV Parks, and Outdoor Recreation guidance)

3

- Janitorial or custodial services (Limited Services guidance)
- Outdoor playgrounds (see <u>CDPH Outdoor Playground guidance</u>)

The guidance is not intended to revoke or repeal any worker rights, either statutory, regulatory or collectively bargained, and is not exhaustive, as it does not include county health orders, nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA.[1] Stay current on changes to public health guidance and state/local orders, as the COVID-19 situation continues. Cal/OSHA has more safety and health guidance on their <u>Cal/OSHA Guidance on Requirements to Protect Workers from Coronavirus webpage</u>. CDC has additional for <u>businesses and employers</u>.

# Required Use of Face Coverings

On June 18, CDPH issued <u>Guidance on the Use of Face Coverings</u>, which broadly requires the use of face coverings for both members of the public and workers in all public and workplace settings where there is a high risk of exposure. Complete details, including all requirements and exemptions to these rules, can be found in the <u>guidance</u>.

The <u>CDPH Face Covering Guidance</u> is subject to additional updates based on the current scientific understanding of transmission of the virus causing COVID-19. Please check the CDPH website for any revisions.

4

 # Workplace Specific Plan

- Establish a written, workplace-specific COVID-19 prevention plan at every facility, perform a comprehensive risk assessment of all work areas and work tasks, and designate a person at each facility to implement the plan.

- Incorporate the CDPH Face Covering Guidance into the Workplace Specific Plan and include a policy for handling exemptions.

- Identify contact information for the local health department where the facility is located for communicating information about COVID-19 outbreaks among workers or patrons.

- Train and communicate with workers and worker representatives on the plan and make the plan available to workers and their representatives.

- Regularly evaluate the workplace for compliance with the plan and document and correct deficiencies identified.

- Investigate any COVID-19 illness and determine if any work-related factors could have contributed to risk of infection. Update the plan as needed to prevent further cases.

- Implement the necessary processes and protocols when a workplace has an outbreak, in accordance with CDPH guidelines and orders or guidance from the local health department.

- Identify close contacts (within six feet for 15 minutes or more) of an infected worker and take steps to isolate COVID-19 positive worker(s) and close contacts.

- Notify all employees in writing, and employers of subcontracted employees, who may have been exposed to COVID-19 and report workplace outbreaks to the local health department. For additional information on employer responsibilities under AB 685 (Chapter 84, Statutes of 2020), refer to the Enhanced Enforcement and Employer Reporting Requirements from Cal/OSHA and the Employer Questions about AB 685 from CDPH.

- **For outdoor operations:** Establish an effective heat illness prevention plan with written procedures. See the Cal/OSHA heat illness prevention page for resources, including FAQs, a webinar, and a sample written plan. Elements of a heat illness prevent plan include:

  o Access to water

  o Access to shade

  o Cool down breaks

5

- o Emergency procedures for heat illness cases
- o Monitoring of employees who are acclimatizing during a heat wave
- o Training on heat illness prevention and symptoms

- Adhere to the guidelines below. Failure to do so could result in workplace illnesses that may cause operations to be temporarily closed or limited.

 # Topics for Worker Training

- Information on COVID-19, how to prevent it from spreading, and which people are at higher risk for severe illness or death.

- Self-screening at home, including temperature and/or symptom checks using CDC guidelines.

- The importance of not coming to work:

  - o If a worker has symptoms of COVID-19 as described by the CDC, such as a fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea, vomiting, or diarrhea, OR

  - o If a worker was diagnosed with COVID-19 and has not yet been released from isolation, OR

  - o If, within the past 14 days, a worker has had contact with someone who has been diagnosed with COVID-19 and is considered potentially infectious (i.e. still on isolation).

- To return to work after a worker receives a COVID-19 diagnosis only after meeting CDPH Guidance on Returning to Work or School Following COVID-19 Diagnosis.

- To seek medical attention if their symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on CDC's webpage.

- The importance of frequent handwashing with soap and water, including scrubbing with soap for 20 seconds (or using hand sanitizer with at least 60% ethanol (preferred) or 70% isopropanol (if the product is inaccessible to unsupervised children) when workers cannot get to a sink or handwashing station, per CDC guidelines). Never use hand sanitizers with methanol due to its high toxicity to both children and adults.

- The importance of physical distancing, both at work and off work time (see Physical Distancing section below).

6

- Proper use of face coverings, including:

    o Face coverings are not personal protective equipment (PPE).

    o Face coverings do not replace the need for physical distancing and frequent handwashing.

    o Face coverings must cover the nose and mouth.

    o Workers should wash or sanitize hands before and after using or adjusting face coverings.

    o Avoid touching eyes, nose, and mouth.

    o Face coverings must not be shared and should be washed or discarded after each shift.

- Information contained in the <u>CDPH Guidance for the Use of Face Coverings</u>, which mandates the circumstances in which face coverings must be worn and the exemptions, as well as any policies, work rules, and practices the employer has adopted to ensure the use of face coverings. Training should also include the employer's policies on how people who are exempted from wearing a face covering will be handled.

- Heat illness symptoms and prevention following <u>Cal/OSHA requirements</u>.

- Ensure independent contractors, temporary, or contract workers at the facility are also properly trained in COVID-19 prevention policies and have necessary supplies and PPE. Discuss these responsibilities ahead of time with organizations supplying temporary and/or contract workers.

- Information on paid leave benefits the worker may be entitled to receive that would make it financially easier to stay at home. See additional information on <u>government programs supporting sick leave and workers' compensation for COVID-19</u>, including workers' sick leave rights under the <u>Families First Coronavirus Response Act</u>.



# Individual Control Measures and Screening

- Provide temperature and/or symptom screenings for all workers at the beginning of their shift and any vendors or contractors entering the facility. Make sure the temperature/symptom screener avoids close contact with workers to the extent possible.

- If requiring self-screening at home, which is an appropriate alternative to providing it at the establishment, ensure that screening was performed prior to the worker leaving the home for their shift and follows <u>CDC guidelines</u>, as described in the Topics for Worker Training section above.

- Encourage workers who are sick or exhibiting symptoms of COVID-19 to stay home.

- Employers must provide and ensure workers use all required protective equipment, including eye protection and gloves where necessary.

- Employers should consider where disposable glove use may be helpful to supplement frequent handwashing or use of hand sanitizer; examples are for workers who are screening others for symptoms or handling commonly touched items.

- Workers who consistently must be within six feet of patrons or co-workers must wear a secondary barrier (e.g., face shield or safety goggles) in addition to a face covering. All employees should minimize the amount of time spent within six feet of guests.

- Workers should wash hands on arrival at work, after working with each fitness facility member, after touching their face covering, after using the restroom, and when leaving work.

- If indoors, workers and patrons must wear face coverings at all times except when showering or swimming where indoor pools are allowed to open. Showering at home is encouraged where possible.

- The CDPH guidance exempts workers and patrons from wearing face coverings while engaged in exercise outdoors, as long as they are able to maintain a distance of at least six feet from others.

- If possible, implement a reservation system for the facility. Utilize the reservation system to contact patrons with reservations 24 hours before their scheduled arrival to confirm their reservation and ask if they or someone in their household is exhibiting any COVID-19 symptoms. If the patron answers in the affirmative the patron should be reminded that they should only utilize the fitness facility if they do not pose a health risk to other patrons or fitness facility workers. Such communication can be done via app, email, or text, if possible. Consider limiting the duration of use for patrons to accommodate more clients while maintaining capacity restrictions.

- Remind patrons in advance to bring a face covering, otherwise they should not be allowed to enter the premises unless exempted per the CDPH Face Covering Guidance. Consider making face coverings available for patrons who may arrive without them.

- Patrons should be temperature and/or symptom screened upon arrival and asked to use hand sanitizer and to wear face coverings in accordance with CDPH guidance. Operators have the right to cancel reservations for individuals/parties with symptomatic patrons and refuse entry.

8

**Exhibit D, Page 8 of 16**

- Fitness facilities must take reasonable measures, including posting signage at all entrances and in strategic and highly-visible locations, to remind workers and the public about the use of face coverings and the importance of practicing physical distancing.



# Ventilation, Cleaning, and Disinfecting Protocols

- Where possible, install portable high-efficiency air cleaners, upgrade the building's air filters to the highest efficiency possible, and make other modifications to increase the quantity of outside air and ventilation in offices and other spaces.

- Check the CDPH website periodically for updates on indoor air quality and ventilation guidance for airborne diseases in indoor settings.

- Evaluate the existing ventilation, cleaning, and disinfecting protocols for the fitness facility, including reception areas, locker rooms, restrooms, changing areas, and showers and update the protocols where necessary. Fitness facilities should be prepared to:

  o Clean HVAC intakes and returns daily.

  o Develop a detailed schedule and adjust or modify operating hours to provide adequate time for regular, thorough cleaning and disinfecting throughout the day.

  o Perform thorough cleaning throughout the day in high traffic areas, such as reception and lobby areas, changing rooms, locker rooms, and break rooms and areas of ingress and egress including stairways, stairwells, escalators, handrails, and elevator controls.

  o Frequently disinfect commonly used surfaces, including personal exercise machines and equipment, countertops, vending machines, doorknobs, and hand washing facilities.

  o Provide time for workers to implement cleaning practices during their shift. Cleaning assignments should be assigned during working hours as part of the workers' job duties.

  o Make sure all workers have been trained to use and have an adequate supply of all-purpose cleaners and disinfectants, when needed. Follow the complete CDC guidelines for cleaning and disinfection. Follow Cal/OSHA requirements and manufacturer instructions for safe use and required personal protective equipment for cleaning products.

  o Workers should have enough ventilation (air flow) in areas where

they are disinfecting. If cleaning in a bathroom or other small space, make sure the door and windows are propped open.

- o Workers should be supplied with first aid supplies, including bandages or other items to cover any cuts, scratches, or open wounds on skin and have sufficient supply to change the bandages often.

- o Patrons should be reminded to maintain six feet of distance from janitorial or custodial workers. Implement a process to regularly check in with workers to ensure visitors are following this protocol. Ensure workers are able to share such information without fear of reprisal or retaliation.

- o Procure options for third-party cleaning companies to assist with the increased cleaning demand, as needed.

- Equip entrances and exits, exercise machines, fitness rooms, changing rooms and locker rooms, and other areas with proper sanitation products, including hand sanitizer and sanitizing wipes, and provide personal hand sanitizers to workers who regularly engage with patrons (e.g., reception workers).

- Require patrons to disinfect individual exercise equipment, mats, and machines before and after use with provided disinfecting wipes. Ensure that lined, non-touch trash receptacles are available throughout the fitness facility to dispose of used wipes.

- If members are unable or unwilling to wipe/disinfect equipment after exercise, provide "ready to clean" tags for members to place on equipment after use, to ensure equipment is disinfected before the next use.

- Consider implementing a check-out system for patrons to utilize any small equipment and accessories (i.e. exercise bands, ropes, mats, foam rollers, etc.). Develop a process to clean and disinfect these items upon return.

- Follow CDC guidelines to ensure that all water systems are safe to use after a prolonged facility shutdown to minimize the risk of Legionnaires' disease and other diseases associated with water.

- Wherever possible, install touchless, automatic water dispensers for use with personal, reusable water bottles or single-use, disposable paper cups. Display signage reminding workers and patrons that the bottle or cup should not touch the water dispenser. If a touchless water dispenser is not feasible, remind workers and patrons to wash their hands or use proper hand sanitizer before and after touching the water release button on drinking fountains.

- Encourage patrons to bring their own towels and mats and consider disbanding the provision of any facility-provided towels or personal

10

hygiene products.

- For any towels, cloth wipes, or other laundered items that are used at the facility, follow CDC guidelines for those items. Provide a closed container where patrons can place used towels or other items. Ensure those items cannot be used again until properly laundered either by a commercial laundering service or a laundering process which includes immersion in water of at least 160 degrees Fahrenheit for at least 25 minutes. Store all clean linens in a clean, covered place. Ensure workers who handle dirty linens or laundry wear gloves.

- Workers and patrons should avoid shaking hands, bumping fists or elbows, and should maintain physical distance unless unavoidable. Workers should also avoid sharing tools, phones, electronics, and office supplies as much as possible and, where feasible, ensure workers have dedicated workstations for their personal use. Never share PPE.

- When choosing disinfecting chemicals, use products approved for use against COVID-19 on the Environmental Protection Agency (EPA)-approved list and follow product instructions. Use disinfectants labeled to be effective against emerging viral pathogens, diluted household bleach solutions (5 tablespoons per gallon of water), or alcohol solutions with at least 70% alcohol that are appropriate for the surface. Provide workers training on the chemical hazards, manufacturer's directions, ventilation requirements, and Cal/OSHA requirements for safe use. Workers using cleaners or disinfectants must wear gloves and other protective equipment as required by the product. Follow the asthma-safer cleaning methods recommended by the California Department of Public Health and ensure proper ventilation.

- Where possible, do not clean floors by sweeping or other methods that can disperse pathogens into the air unless all persons in the area have appropriate PPE. Use a vacuum with a HEPA filter wherever possible.

- Place signage throughout the fitness facility emphasizing basic infection prevention measures, including the importance of wearing face coverings and frequent handwashing.



# Physical Distancing Guidelines

- **WARNING**: physical distancing alone is insufficient to prevent transmission of COVID-19 and physical distances greater than six feet are recommended for high-exertion activities.

- Implement measures to ensure physical distancing of at least six feet between and among workers and patrons. This can include use of physical partitions or visual cues (e.g., floor markings, colored tape, or signs to indicate to where workers and/or patrons should stand during

check-in at reception areas or when waiting to use equipment).

- Space equipment at least six feet apart, with greater distancing for treadmills and other high-exertion aerobic fitness equipment. Equipment can be arranged in an "X" pattern to provide greater distancing. Physical barriers can also be helpful to minimize exposure between patrons or segregate exercise areas.

- Equip the front desk area with Plexiglas or other impermeable barriers, if feasible, to minimize the interaction between reception workers and patrons. Implement virtual, touchless check-in tools, if possible, so that patrons do not have to utilize the reception space.

- Consider implementing special hours designated for high risk or medically-vulnerable populations, including seniors with admittance by reservation only.

- For outdoor operations, establish an outdoor reception area where patrons can check in while still following physical distancing guidelines. Take measures at reception desks or other areas where physical distancing cannot be maintained to minimize exposure between workers and customers, such as Plexiglas or other barriers.

- For outdoor operations, create outdoor break areas with shade covers and seating that ensures physical distancing, where possible.

- Consider the following modifications to maintain physical distancing:

  o Implementing an online reservation-based system, as suggested in the Individual Control Measures and Screening section of this document, to avoid patrons queuing in the facility or outside and help maintain occupancy levels.

  o Permitting only those patrons that are actually exercising inside the facility. Patrons should not wait in the reception area.

  o Using one-way foot traffic patterns throughout the fitness facility with visual cues and signs.

  o Staggering available lockers in locker rooms to maintain physical distancing.

  o Spacing all equipment and machines at least six feet apart or taking some out of service to achieve physical distancing.

  o Adjusting personal training so that the exercise instructor maintains a minimum of six feet of physical distance.

  o Modifying group training classes to limit the class size to ensure a minimum of six feet of physical distance between patrons and/or move the classes outdoors or to larger spaces like full-sized basketball

12

courts, if possible. Group exercise classes should only be offered if distancing requirements can be maintained and there is no person-to-person physical contact.

- High contact programs that require close contact less than six feet in distance should be suspended. This would include activities such as group sporting events, organized intermural activities, pick-up basketball, or organized races.

- Adjust in-person meetings for workers, if they are necessary, to ensure physical distancing and use virtual options or smaller meetings at facilities to maintain physical distancing guidelines.

- Consider offering workers who request modified duties options that minimize their contact with patrons and other workers (e.g., managing administrative needs through telework).

- Stagger worker breaks, in compliance with wage and hour regulations, to maintain physical distancing protocols.

- Ensure workers can maintain physical distance in breakrooms, using barriers, increasing distance between tables/chairs to separate workers, etc. Where possible, create outdoor break areas with shade coverings and seating arrangements that ensures physical distancing. Discourage workers from congregating during breaks and ensure they are not eating or drinking without face coverings within six feet of each other.



# Additional Considerations for Communal Restrooms and Shower Facilities

- Fitness facilities should consider staffing and other capacity and resource needs to ensure that locker rooms and shower facilities can be cleaned and disinfected regularly throughout the day.

- Shared restroom facilities and locker rooms should be cleaned regularly throughout the day using EPA-registered disinfectants. High-touch surfaces such as faucets, toilets, doorknobs, and light switches must be frequently cleaned and disinfected.

- Create and post a cleaning schedule for the restroom facilities and locker rooms. Post the cleaning schedule on the front of the door so patrons know when they can/cannot use the restroom and/or locker room. Make sure to close the restroom during the cleaning and disinfecting process.

- Consider using a checklist or audit system to track how often cleaning is conducted.

13

- Only allow shower and locker room use if partitions are in place or signs have been posted to specify physical distancing requirements. If partitions or proper distancing are not possible, these facilities should remain closed.

- Ensure that sanitary facilities stay operational and are continuously stocked at all times. Provide additional soap, paper towels, and hand sanitizer when needed. Install hands-free devices, if possible, including motion sensor sinks faucets, soap dispensers, sanitizer dispensers, and paper towel dispensers.

- Consider modifying doors to multi-stall restrooms to be able to be opened and closed without touching the handles, using opening-devices, or powered door operators with the hand, whenever possible. If the door cannot be opened without touching the handle or door-operator with the hand, place a trash-receptacle by the door to ensure a paper towel can be readily disposed of when operating the door. The location and positioning of waste receptacles should not interfere with egress, evacuation, emergency equipment, or any reasonable accommodations provided under the Americans with Disabilities Act. Make sure trash cans are emptied regularly.

- Provide information on how to wash hands properly, including hanging signs in restrooms.



## Additional Considerations for Swimming Pools / Aquatic Venues

- Fitness facilities with swimming pools, splash pads, hot tubs, saunas, and steam rooms must take additional steps to ensure those facilities are properly cleaned and disinfected for patron use, according to CDC guidelines.

- Facilities with an openly accessible outdoor hot tub must ensure that at least six feet of distancing is maintained at all times between hot tub users not from the same household or limit its use to one household group at a time.

  o Patrons should remove face coverings while they are in the hot tub, due to the likelihood they will become wet, but must wear them as required when outside of the hot tub.

  o Facilities should provide a receptacle for collection of used towels for laundry, and clean and disinfect high touch surfaces regularly.

  o Post signage regarding distancing and face covering requirements.

14

- o Facility staff must monitor compliance with distancing requirements and, if it is not possible to consistently maintain distancing, must discontinue use of the hot tub.

- Hot tub operations with individual, private outdoor hot tubs for hire must limit their use to one household group at a time.

  - o Patrons should remove face coverings while they are in the hot tub, due to the likelihood they will become wet, but must wear them as required when outside of the hot tub.

  - o Post signage regarding face covering requirements.

  - o Between hot tub uses, operators should collect any used towels for laundry. Clean and disinfect high touch surfaces.

- For indoor pools, face coverings must be worn when out of the water or shower areas, unless exempt from the CDPH guidance. Cloth face coverings can be difficult to breathe through when they are wet. Face coverings should be put away when not in use so they are not accidentally touched or picked up by others.

- For outdoor pools, face coverings must be worn when out of the water, unless exempt under the CDPH guidance.

- Maintain proper disinfectant levels (1-10 parts per million free chlorine or 3-8 ppm bromine) and pH (7.2-8).

- Consult with the company or engineer that designed the aquatic venue to decide which List N disinfectants approved by the EPA are best for the aquatic venue. Ensure the safe and correct use and storage of disinfectants, including storing products securely away from children.

- Set up a system so that furniture and equipment (e.g., lounge chairs) that needs to be cleaned and disinfected is kept separate from furniture that has already been cleaned and disinfected. Label containers for used equipment that has not yet been cleaned and disinfected and containers for cleaned and disinfected equipment.

- Encourage patrons to bring and use their own towels wherever possible. If the facility is providing them, launder towels according to the

  manufacturer's instructions. Use the warmest appropriate water temperature and dry items completely. Handle towels with disposable gloves and minimal disturbance, i.e., do not shake them.

- Discourage people from sharing items, particularly those that are difficult to clean and disinfect or those that are meant to come in contact with the face (e.g., goggles, nose clips, and snorkels).

- Ensure that the facility has adequate equipment for patrons, such as kick

15

boards, pool noodles, and other flotation devices, to minimize sharing wherever possible. Clean and disinfect the items after each use.

- For indoor aquatic venues, introduce and circulate outdoor air as much as possible by opening windows and doors, using fans, or other methods. However, do not open windows and doors if doing so poses a safety risk to workers, patrons, or swimmers.

- Change the deck layout and other areas surrounding the pool to ensure that the standing and seating areas can support physical distancing requirements. This could include removing lounge chairs or taping off areas to discourage use.

- Provide physical cues or guides (e.g., lane lines in the water or chairs and tables on the deck) and visual cues (e.g., tape on the decks, floors, or sidewalks) and signs to ensure that workers, patrons, and swimmers stay at least six feet apart from one another, both in and out of the water.

- Where feasible, install impermeable physical barriers such as Plexiglas where workers and patrons must interact and physical distancing is difficult.

- Consider implementing reservations for pool use or implementing other mechanisms to support physical distancing. This could include reserving full-lanes for individual lap swimming, maintain swimmers in alternating lanes, and half-lanes for individual household use.

- Ensure that lifeguards who are actively lifeguarding are not also expected to monitor handwashing, use of cloth face coverings, or physical distancing. Assign this monitoring responsibility to another worker.

- Aquatic venues should avoid activities that promote group gatherings and should be aware of state and local policies on youth and adult sports and gathering requirements to determine if aquatic fitness classes, swim lessons, swim team practices, swim meets, or pool parties can be held.

- CDC's Model Aquatic Health Code has more recommendations to prevent illness and injuries at public pools in parks.

---

[1]Additional requirements must be considered for vulnerable populations. Fitness facilities must comply with all Cal/OSHA standards and be prepared to adhere to its guidance as well as guidance from the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH). Additionally, employers must be prepared to alter their operations as those guidelines change.

 

**Exhibit D, Page 16 of 16**

# Exhibit E



State of California—Health and Human Services Agency
# California Department of Public Health



SANDRA SHEWRY, MPH, MSW
*Acting Director*
ERICA S. PAN, MD, MPH
*Acting State Health Officer*

GAVIN NEWSOM
*Governor*

**Regional Stay At Home Order**
**12/03/2020**

Upon assessment of the recent, unprecedented rise in the rate of increase in COVID-19 cases, hospitalizations, and test positivity rates across California, the California Department of Public Health (CDPH) is taking immediate actions to prevent the spread of the virus.

The State, like the nation, continues to record an unprecedented surge in the level of community spread of COVID-19. California implemented an accelerated application of the Blueprint Framework metrics on November 16 and a limited Stay at Home Order issued on November 19. However, in the interim, the number of new cases per day has increased by over 112%, (from 8,743 to 18,588) and the rate of rise of new cases per day continues to increase dramatically. The number of new hospital admissions has increased from 777 on November 15, to 1,651 on December 2, and because of the lag between case identification and hospitalizations, we can only expect these numbers to increase.

Current projections show that without additional intervention to slow the spread of COVID-19, the number of available adult Intensive Care Unit (ICU) beds in the State of California will be at capacity in mid-December.  This is a sign that the rate of rise in cases, if it continues, is at risk of overwhelming the ability of California hospitals to deliver healthcare to its residents suffering from COVID-19 and from other illnesses requiring hospital care. ICU beds are a critical resource for individuals who need the most advanced support and care and the ability to add additional ICU capacity is limited by the lack of available ICU nurses and physicians as a result of the nationwide surge in hospitalizations and ICU admissions.

Because the rate of increases in new cases continues to escalate and threatens to overwhelm the state's hospital system, further aggressive action is necessary to respond to the quickly evolving situation. While vaccines are promising future interventions, they are not available to address the immediate risks to healthcare delivery in the current surge. The immediate aggressive institution of additional non-pharmaceutical public health interventions is critical to avoid further overwhelming hospitals and to prevent the need to ration care.

**NOW, THEREFORE, I, as Acting State Public Health Officer of the State of California, order:**

1. CDPH will evaluate public health based on Regions, responsive to hospital capacity for persons resident in those Regions.

2. CDPH will evaluate the adult ICU bed capacity for each Region and identify on covid19.ca.gov any Regions for which that capacity is less than 15%. When that capacity is less than 15%, the following terms (the Terms of this Order) will apply.

   a. All gatherings with members of other households are prohibited in the Region except as expressly permitted herein.

   b. All individuals living in the Region shall stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure,[1] as required by law, or as specifically permitted in this order.

   c. Worship and political expression are permitted outdoors, consistent with existing guidance for those activities.

   d. Critical infrastructure sectors may operate and must continue to modify operations pursuant to the applicable sector guidance.

   e. Guidance related to schools remain in effect and unchanged. Accordingly, when this Order takes effect in a Region, schools that have previously reopened for in-person instruction may remain open, and schools may continue to bring students back for in-person instruction under the Elementary School Waiver Process or Cohorting Guidance.

   f. In order to reduce congestion and the resulting increase in risk of transmission of COVID-19 in critical infrastructure retailers, all retailers may operate indoors at no more than 20% capacity and must follow the guidance for retailers. All access to retail must be strictly metered to ensure compliance with the limit on capacity. The sale of food, beverages, and alcohol for in-store consumption is prohibited.

   g. To promote and protect the physical and mental well-being of people in California, outdoor recreation facilities may continue to operate. Those facilities may not sell food or drink for on-site consumption. Overnight stays at

---

[1] See https://covid19.ca.gov/essential-workforce/ for full list of California's Critical Infrastructure workforce.

**Exhibit E, Page 2 of 4**

campgrounds are not permitted.

h. Nothing in this Order prevents any number of persons from the same household from leaving their residence, lodging, or temporary accommodation, as long as they do not engage in any interaction with (or otherwise gather with) any number of persons from any other household, except as specifically permitted herein.

i. Terms (a) and (b) of this section do not apply to persons experiencing homelessness.

3. Except as otherwise required by law, no hotel or lodging entity in California shall accept or honor out of state reservations for non-essential travel, unless the reservation is for at least the minimum time period required for quarantine and the persons identified in the reservation will quarantine in the hotel or lodging entity until after that time period has expired.

4. This order shall take effect on December 5, 2020 at 1259pm PST.

5. For Regions where the adult ICU bed capacity falls below 15% after the effective date of this order, the Terms of this Order shall take effect 24 hours after that assessment.

6. The Terms of this Order shall remain in place for at least three weeks from the date the order takes effect in a Region and shall continue until CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%. Four-week adult ICU bed capacity projections will be made approximately twice a week, unless CDPH determines that public health conditions merit an alternate projection schedule. If after three weeks from the effective date of the Terms of this Order in a Region, CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%, the Terms of this Order shall no longer apply to the Region

7. After the termination of the Terms of this Order in a Region, each county within the Region will be assigned to a tier based on the Blueprint for a Safer Economy as set out in my August 28, 2020 Order, and the County is subject to the restrictions of the Blueprint appropriate to that tier.

8. I will continue to monitor the epidemiological data and will modify this Regional Stay-at-Home Order as required by the evolving public health conditions. If I determine that it is necessary to change the Terms of this Order, or otherwise modify the Regional Stay-at-Home Order, these modifications will be posted at covid19.ca.gov.

**Exhibit E, Page 3 of 4**

9.  When operative in a Region, the Terms of this Order supersede any conflicting terms in other CDPH orders, directives, or guidance. Specifically, for those Regions with ICU bed capacity triggering this order, the Terms of this Order shall supersede the State's Blueprint for a Safer Economy and all guidance (other than guidance for critical infrastructure sectors) during the operative period. In all Regions that are not subject to the restrictions in this order, the Blueprint for a Safer Economy and all guidance shall remain in effect.

10. This order is issued pursuant to Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120175,120195 and 131080; EO N-60-20, N-25-20, and other authority provided for under the Emergency Services Act; and other applicable law.

Erica S. Pan, MD, MPH
Acting State Public Health Officer
California Department of Public Health

**Exhibit E, Page 4 of 4**

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):*
MICHAEL G. WALKER, County Counsel, County of Ventura  S/B No. 150554
JACLYN SMITH, Assistant County Counsel  S/B No. 274311
800 South Victoria Avenue, L/C 1830, Ventura, CA  93009-1830
TELEPHONE NO. (805) 654-2773       FAX NO. *(Optional):* (805) 654-2185
ATTORNEY FOR *(Name):* Attorneys for Plaintiffs County of Ventura and Robert Levin, M.D.
In His Capacity as Health Officer for Ventura County

SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA
STREET ADDRESS: 800 South Victoria Avenue
MAILING ADDRESS:
CITY AND ZIP CODE: Ventura, CA 93009
BRANCH NAME: Ventura

*FOR COURT USE ONLY*

VENTURA
SUPERIOR COURT
FILED

JAN 08 2021

MICHAEL D. PLANET
Executive Officer and Clerk
By: _____ M SOTO _____ , Deputy

CASE NAME: COUNTY OF VENTURA, et al. v. HOUSE OF GAINS GYM, INC.; DAVID FIGG, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000)  [ ] Limited (Amount demanded is $25,000) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 56-2021-00549346-CU-MC-VTA  JUDGE:  DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[X] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [ ] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 1-8-2021

JACLYN SMITH
(TYPE OR PRINT NAME)

*Jaclyn Smith*  PDF signature
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award *(not unpaid taxes)*
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form | | Clear this form |

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF VENTURA
**800 South Victoria Avenue**
**Ventura , CA 93009**
**(805) 289-8525**
WWW.VENTURA.COURTS.CA.GOV

## NOTICE OF CASE ASSIGNMENT AND MANDATORY APPEARANCE

Case Number: **56-2021-00549346-CU-MC-VTA**

Your case has been assigned for all purposes to the judicial officer indicated below.

**A copy of this Notice of Case Assignment and Mandatory Appearance shall be served by the filing party on all named Defendants/Respondents with the Complaint or Petition, and with any Cross-Complaint or Complaint in Intervention that names a new party to the underlying action.**

| ASSIGNED JUDICIAL OFFICER | COURT  LOCATION | DEPT/ROOM |
|---|---|---|
| Hon. Mark Borrell | Ventura | 40 |
| **HEARING** | | |

| EVENT DATE | EVENT TIME | EVENT DEPT/ROOM |
|---|---|---|
| | | |

## SCHEDULING INFORMATION

**Judicial Scheduling Information**

**APPEARANCE AT THE ABOVE HEARING IS MANDATORY.**
**Each party must file a Case Management Statement no later than 15 calendar days prior to the hearing and serve it on all parties. If your Case Management Statement is untimely, it may NOT be considered by the court (CRC 3.725).**
**If proof of service and/or request for entry of default have not been filed: At the above hearing you are ordered to show cause why you should not be compelled to pay sanctions and/or why your case should not be dismissed  (CCP 177.5, Local Rule 3.17).**

**Advance Jury Fee Requirement**

At least one party demanding a jury trial on each side of a civil case must pay a non-refundable jury fee of $150. The non-refundable jury fee must be paid timely pursuant to Code of Civil Procedure section 631.

**Noticed Motions/Ex Parte Matters**

To set an ex parte hearing, contact the judicial secretary in the assigned department.  Contact the clerk's office to reserve a date for a law and motion matter.

**Telephonic Appearance**

Telephonic appearance at the Case Management Conference is permitted pursuant to CRC 3.670.  In addition, see Local Rule 7.01 regarding notice to the teleconference provider.  The court, through the teleconference provider, will contact all parties and counsel prior to the hearing.

Date:  01/08/2021

Clerk of the Court,
By: _CA. Soto_
Marisela Soto, Clerk

VEN-FNR082

# EXHIBIT B

Melissa G. Fulgencio (SBN 277663)
E-mail: mel@upliftlaw.net
Crystal A. Dumbleton (SBN 323361)
E-mail: crystal@upliftlaw.net
**UPLIFT LAW, PC**
650 N. Rose Drive, Ste. 620
Placentia, CA 92870
Telephone:  (714) 248-5612
Facsimile:   (714) 582-3990

Attorneys for Defendants,
HOUSE OF GAINS and DAVID FIGG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| COUNTY OF VENTURA and ROBERT LEVIN, M.D., in his capacity as Health Officer for Ventura County,<br><br>Plaintiff,<br><br>v.<br><br>HOUSE OF GAINS GYM, INC.; DAVID FIGG; and DOES 1-1000, inclusive<br><br>Defendants. | Case No.: _____<br>[Ventura County Superior Court Case No. 56-202 1 -005 49346-CU-MC-VTA]<br><br><br>**NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL OF THIS ACTION TO FEDERAL COURT** |

**[REMAINDER OF PAGE INTENTIONALL LEFT BLANK]**

1        TO THE HONORABLE COURT, THE CLERK OF THE LOS ANGELES SUPERIOR

2   COURT, PLAINTIFF, AND ALL ATTORNEYS OF RECORD:

3        NOTICE IS HEREBY GIVEN THAT, on February 4, 2021, Defendants House of Gains

4   Gym, Inc., and David Figg, through their counsel, Uplift Law PC, filed in the United States

5   District Court for the Central District of California, Western Division, a Notice of Removal of the

6   above-captioned matter. Attached hereto as Exhibit 1 is a true and correct copy of the Notice of

7   Removal filed with the Federal Court. Pursuant to 28 U.S.C. § 1446(d), filing the attached

8   paperwork with the United States District Court for the Central District of California, Western

9   Division, along with filing a copy of this paperwork with this Court, effects the removal of this

10  action and requires that this Court take no further action unless and until this matter is remanded.

11

12                             **UPLIFT LAW, PC**

13

14  Dated: February 4, 2021       By: _____

15                             Melissa G. Fulgencio

16                             Crystal A. Dumbleton,

                           Attorneys for Defendants,

17                             House of Gains and David Figg

18

19

20

21

22

23

24

25

26

27

28

**NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL OF THIS ACTION TO FEDERAL COURT**